**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LEANDRO ALVAREZ, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>   v.<br><br>PACIRA BIOSCIENCES, INC., DAVID STACK, FRANK D. LEE, AND ANTHONY MOLLOY<br><br>         Defendants. | Case No. 2:25-cv-00322<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Leandro Alvarez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Pacira Biosciences, Inc. ("Pacira" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Pacira's public documents, earnings calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Pacira securities between August 2, 2023 to August 8, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.    Defendants provided investors with material information Pacira's '495 patent validity and scope. In particular, the Company touted widespread protection of Exparel, despite the previous receipt of a negative outcome regarding claims construction in another lawsuit against eVenus involving the '495 patent, as well as Pacira's '336 patent. Defendants' statements included, among other things, confidence in the Company's protections of Exparel, additional patent protections covering Exparel, and optimistic claims that the Company would be able to continue the expanded use of Exparel.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of

Pacira's Exparel patent scope and protections; pertinently, Pacira concealed or otherwise minimized the significance of the New Jersey District Court's holding regarding claims construction and Pacira's attempt to submit new evidence, including exhibits and findings of fact to the Court, which the Court considered and rejected. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Pacira's securities at artificially inflated prices.

4.    On August 9, 2024, Pacira announced that the New Jersey District Court invalidated its '495 patent, holding that eVenus did not infringe on the '495 patent on the basis on obviousness and anticipation. This ruling came shortly after Pacira's submission of additional evidence to the Court, which the Court stated would not have any impact on the basis for the decision. Furthermore, this ruling was secondary to the same court's ruling impacting claims construction for both Pacira's '495 and '336 patents in eVenus's favor.

5.    Pacira's announcement that its '495 patent was invalidated surprised investors and analysts alike as they reacted immediately to the revelations. The price of Pacira's common stock declined dramatically. From a closing market price of $22.36 per share on August 8, 2024, Pacira's stock price fell to a low of $11.70 per share on August 9, 2024, a decline of over 47% in a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Pacira's offices are located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District, including but not limited to the transmission of public statements to the market from Pacira's offices in Parsippany, New Jersey.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Pacira common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Pacira is attached hereto.

12.    Pacira Biosciences, Inc. is a Delaware corporation with a principal executive office located at 5 Sylvan Way, Parsippany, NJ 07054 through which the Company frequently communicates with investors. During the Class Period, the Company's common stock traded on the Nasdaq Global Select Market (the "NASDAQ") under the symbol "PCRX."

13.    Defendant David Stack ("Stack") was the Chairman and Chief Executive Officer of Pacira at the start of the Class Period until January 1, 2024.

14.    Defendant Frank D. Lee ("Lee") was the Chief Financial Officer and member of the Board of Pacira beginning January 2, 2024 and at all relevant times from that point forward.

15.    Defendant Anthony Molloy ("Molloy") was, at all relevant times, the Chief Legal and Compliance Officer of Pacira.

16.    Defendants Stack, Lee, and Molloy are sometimes referred to herein as the "Individual Defendants." Pacira together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Pacira's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Pacira is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Pacira under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

20.     Pacira is an American pharmaceutical company committed to developing and providing non-opioid pan management and regenerative health solutions.

21.     The Company currently offers three commercial-stage non-opioid treatments, including Exparel, Zilretta, and iovera°.

22.     Pacira describes Exparel as a treatment that utilizes the Company's unique and proprietary multivesicular liposome delivery technology that encapsulates drugs without altering their molecular structure and releases them over a sustained period. In February 2018, the FDA published rigorous guidance for proving bioequivalence to multivesicular liposomal bupivacaine. Matching comparative characteristics must be conducted on at least three batches of an ANDA product with at least one batch manufactured at commercial scale and include liposome composition, internal aqueous environment of the liposome, and *in vitro* drug release rates. Unlike traditional liposomes, multivesicular liposomes consist of a non-lamellar honeycomb structure.

7

*The '495 Patent*

23.    The application for US17/156,400 was filed by Pacira on January 22, 2021. Then, on June 15, 2021 the application was granted, published, and given its Patent Number: 11,033,495 (the "'495 patent"). The '495 patent is currently listed as active, and the anticipated expiration is January 22, 2041.

*Pacira Pharm. v. eVenus Pharm. Labs., No. 21-19829 (D.N.J. Aug. 9, 2024)*

24.    On November 8, 2021, Pacira announced that it filed a lawsuit in the United States District Court for the District of New Jersey against eVenus Pharmaceutical Laboratories, Inc. for patent infringement of U.S. Patent Number 11,033,495. The '495 patent is related to EXPAREL® (bupivacaine liposome injectable suspension). The complaint sought an injunction to prevent the infringing manufacture, use, and sale of a potential generic product described in an Abbreviated New Drug Application (ANDA) that eVenus filed with the U.S. Food and Drug Administration in August 2021.

25.    A brief overview of the proceedings is as follows: In February 2024, the Court held a five-day bench trial. Then, on May 7, 2024, the parties appeared before the undersigned for closing arguments. Then, on July 18, 2024, upon Plaintiffs' request, this Court reopened the trial record for the parties to submit additional exhibits and findings of fact. The Court considered this new evidence but does not discuss it in detail as it did not move the needle on the theories upon which

the Court relied to resolve this Matter. Finally, on August 9, 2024, the Court concluded that (1) Claim 7 of the '495 Patent is invalid as obvious in view of the prior art and (2) Claim 7 of the '495 Patent is also invalid as anticipated in view of the prior art. Thus, the '495 patent was invalidated.

*Pacira Pharm. v. eVenus Pharm. Labs., No. 22-00718 (D.N.J. Jun. 6, 2023)*

26.    On February 10, 2022, Pacira filed a second lawsuit against eVenus which, similar to the first one, sought to stop eVenus from developing a generic version of Exparel at different doses.

27.    On June 6, 2023, United States District Court Judge Madeline Cox Arleo for the District of New Jersey, ruled on patent construction in *Pacira Pharm. v. eVenus Pharm. Labs.* The Court declined to limit the term "commercial scale" to the range of 45 liters to 250 liters, thereby allowing eVenus to scale-up the existing manufacturing process was intended to address the "growing demand" for Exparel "given the addictive nature of opioids and the opioid epidemic."

*The Defendants Materially Misled Investors Concerning the Protection Offered by the '495 Patent*

<u>*August 2, 2023*</u>

28.    On August 2, 2023, Defendants reported second quarter 2023 financial results. As part of the business highlights sections, the Company stated, in pertinent part:

Since our inception in 2006, we have devoted most of our cash resources to manufacturing, research and development and selling, general and administrative activities related to the development and commercialization of EXPAREL. In addition, we acquired ZILRETTA as part of the Flexion Acquisition in November 2021 and iovera° as part of the MyoScience Acquisition in April 2019. ***We are primarily dependent on the commercial success of EXPAREL and ZILRETTA.*** We have financed our operations primarily with the proceeds from the sale of convertible senior notes and other debt, common stock, product sales and collaborative licensing and milestone revenue. As of June 30, 2023, we had an accumulated deficit of $142.5 million, cash and cash equivalents and available-for-sale investments of $220.8 million and working capital of $320.4 million.

 …

***We expect to continue to pursue the expanded use of EXPAREL, ZILRETTA and iovera• in additional procedures; progress our earlier-stage product candidate pipeline; advance regulatory activities for EXPAREL, ZILRETTA, iovera• and our other product candidates; invest in sales and marketing resources for EXPAREL, ZILRETTA and iovera•; expand and enhance our manufacturing capacity for EXPAREL, ZILRETTA and iovera•; invest in products, businesses and technologies; and support legal matters.***

(Emphasis added.)

<u>November 2, 2023</u>

29.    On November 2, 2023, Pacira reported third quarter 2023 financial results. As part of the business highlights sections, the Company reiterated the same sentiment found in its second quarter financial results report, in pertinent part:

We expect to continue to pursue the expanded use of EXPAREL, ZILRETTA and iovera° in additional procedures; progress our earlier-stage product candidate pipeline; advance regulatory activities for EXPAREL, ZILRETTA, iovera° and our other product candidates; invest in sales and marketing resources for EXPAREL, ZILRETTA and

iovera°; expand and enhance our manufacturing capacity for EXPAREL, ZILRETTA and iovera°; invest in products, businesses and technologies; and support legal matters.

*November 10, 2023*

30.     On November 10, 2023, Pacira published a press release announcing that the U.S. Food and Drug Administration (FDA) has approved its supplemental new drug application (sNDA) to expand the EXPAREL® (bupivacaine liposome injectable suspension) label to include administration in adults as an adductor canal block and a sciatic nerve block in the popliteal fossa. CEO and Chairman of Pacira, Dave Stack stated, in relevant part:

> We are thrilled that today's approval offers clinicians and patients another option for achieving long-lasting non-opioid pain control with EXPAREL and an increased ability to transition procedures to the ambulatory environment. In line with our corporate mission to provide a non-opioid to as many patients as possible, this new indication provides additional flexibility in the use of EXPAREL as a regional analgesic for more than 3 million lower extremity procedures annually, further increasing the utility of EXPAREL for major orthopedic procedures.

*February 29, 2024*

31.     On February 29, 2024, Pacira reported fourth quarter and full-year 2023 financial results. As part of the business highlights sections, the Company stated, in pertinent part:

> That the patents and the patent applications that we have covering our pMVL (as defined below) products are limited to specific injectable formulations, processes and uses of drugs encapsulated in our pMVL drug delivery technology and our market opportunity for our product

11

candidates may be limited by the lack of patent protection for the active ingredient itself and other formulations and delivery technology and systems that may be developed by competitors.

…

***Two New EXPAREL Patents.*** In November 2023, the United States Patent and Trademark Office issued Patent Nos. 11,819,574 and 11,819,575, claiming composition of EXPAREL prepared by an enhanced manufacturing process and composition of matter for EXPAREL, respectively. Each of these EXPAREL patents are listed in the FDA's "*Approved Drug Products with Therapeutic Equivalence Evaluations*" (the "Orange Book"). ***These two patents are among the ten Orange Book listed patents that are now listed for EXPAREL, all with an expiration date of January 22, 2041.***

…

***In June 2021, the United States Patent and Trademark Office, or USPTO, issued U.S. Patent No. 11,033,495 related to EXPAREL. The patent, "Manufacturing of Bupivacaine Multivesicular Liposomes," claims composition of EXPAREL prepared by an improved manufacturing process. In November 2021, the USPTO issued U.S. Patent Nos. 11,185,506 and 11,179,336, claiming an improved EXPAREL manufacturing process and EXPAREL composition, respectively. Eight U.S. patents relating to product and product-by-process in connection with an improved manufacturing process for EXPAREL were issued between March 2022 and November 2023, providing additional patent protection through 2041.*** In March 2022, the USPTO issued U.S. Patent No. 11,278,494, claiming EXPAREL composition. In April 2022, the USPTO issued U.S. Patent Nos. 11,304,904 and 11,311,486, claiming composition of EXPAREL prepared by an improved manufacturing process and EXPAREL composition, respectively. In June 2022, the USPTO issued U.S. Patent No. 11,357,727, claiming composition of EXPAREL prepared by an improved manufacturing process. In August 2022, the USPTO issued U.S. Patent No. 11,426,348, claiming EXPAREL batch compositions. In September 2022, the USPTO issued U.S. Patent No. 11,452,691, claiming EXPAREL batch compositions. In November 2023, the USPTO issued U.S. Patent Nos. 11,819,574 and 11,819,575, claiming

batch compositions of EXPAREL prepared by an improved manufacturing process and compositions of EXPAREL respectively.

...

***Our success depends primarily on our ability to successfully commercialize EXPAREL and ZILRETTA.***

We have invested a significant portion of our efforts and financial resources in the development and commercialization of our lead product, EXPAREL, which was first approved by the FDA on October 28, 2011 and commercially launched in April 2012. EXPAREL was approved by the EC (which included the U.K.) on November 16, 2020. During 2023, sales of EXPAREL accounted for 80% of our total revenue, and we expect EXPAREL sales will remain of primary importance for the foreseeable future. We added ZILRETTA to our product portfolio upon completing the Flexion Acquisition in November 2021 and it accounted for 16% of our total revenue in 2023. Our success primarily depends on our ability to continue to effectively commercialize EXPAREL and ZILRETTA.

…

Any disruption in our ability to generate revenues from the sale of EXPAREL and ZILRETTA will have a material and adverse impact on our results of operations and financial condition.

Our efforts to successfully commercialize EXPAREL and ZILRETTA are subject to many internal and external challenges and if we cannot overcome these challenges in a timely manner, our future revenues and profits could be materially and adversely impacted.

EXPAREL has been a commercialized drug since April 2012. We continue to expend significant time and resources to train our sales force to be credible and persuasive in convincing physicians, hospitals and ASCs to use EXPAREL. In addition, we also must train our sales force to ensure that a consistent and appropriate message about EXPAREL is delivered to our potential customers. If we are unable to effectively train our sales force and equip them with effective materials, including medical and sales literature to help them inform and educate potential customers about the benefits and risks of EXPAREL and its

proper administration, our efforts to successfully commercialize EXPAREL could be put in jeopardy, which could have a material adverse effect on our future revenues and profits.

…

If EXPAREL does not achieve broader market acceptance, the revenues that we generate from its sales will be limited.

…

Our ability to effectively promote and sell EXPAREL and any product candidates that we may develop, license or acquire in the hospital or ASC marketplace will also depend on pricing and cost effectiveness, including our ability to produce a product at a competitive price and therefore achieve acceptance of the product onto hospital formularies, and our ability to obtain sufficient third-party coverage or reimbursement. We will also need to demonstrate acceptable evidence of safety and efficacy, as well as relative convenience and ease of administration. Market acceptance could be further limited depending on the prevalence and severity of any expected or unexpected adverse side effects associated with our product candidates.

(Emphasis added.)

### *May 7, 2024*

32.    On May 7, 2024, Pacira reported first quarter 2024 financial results. As part of the business highlights sections, the Company stated, in relevant part:

We expect to continue to pursue the expanded use of EXPAREL, ZILRETTA and iovera° in additional procedures; progress our earlier-stage product candidate pipeline; advance regulatory activities for EXPAREL, ZILRETTA, iovera°, PCRX-201 and our other product candidates; invest in sales and marketing resources for EXPAREL, ZILRETTA and iovera°; expand and enhance our manufacturing capacity for EXPAREL, ZILRETTA and iovera°; invest in products, businesses and technologies; and support legal matters.

…

14

Launching EXPAREL in two new lower extremity nerve block indications. In February 2024, we launched EXPAREL in two key lower extremity nerve blocks—namely an adductor canal block and a sciatic nerve block in the popliteal fossa. We believe these two key nerve blocks provide the opportunity to significantly expand EXPAREL utilization within surgeries of the knee, lower leg, and foot and ankle procedures. The launch is supported by two successful head-to-head Phase 3 studies in which EXPAREL demonstrated four days of superiority to bupivacaine.

*July 30, 2024*

33.    On July 30, 2024, Pacira hosted a second quarter 2024 earnings call.

CEO Frank D. Lee stated in relevant part:

Let's start by walking through the 3 key 2024 priorities. ***First, expanding the utilization of EXPAREL as a lower extremity nerve block***; second, preparing the market for separate Medicare reimbursement at average selling price or ASP plus 6% with the implementation of NOPAIN Act in 2025; and third, broadening patient access to EXPAREL through new GPO partnerships. I'll start with lower extremity nerve block, where we continue to see positive market receptivity across all sites of care. ***To remind you, the rollout of EXPAREL lower extremity nerve block is supported by compelling clinical data from 2 Phase III studies that demonstrated 4 days of superiority versus bupivacaine.***

…

Recent progress includes a publication of 3 robust retrospective real-world studies in colorectal, spine and breast reconstruction surgeries. Each study compare patients who received EXPAREL with patients who did not. EXPAREL was associated with reduced opioid use as well as lower emergency department visits, length of stay, and hospital readmission rates. To drive education awareness among our primary stakeholders, we recently launched our national campaign, [ Make The NOPAIN impact ]. the campaign is targeting hospital pharmacists, administrators, clinicians and revenue management teams.

…

The discussion focused on our commitment to partnering with health systems and NOPAIN. We also utilize opportunities to drive awareness around NOPAIN within the Premier membership base. ***Importantly, we have 2 additional GPO partnerships expected to go live this year with both offerings similar opportunities to expand patient access to EXPAREL.***

…

Thank you, Charlie. In closing, I'm proud of the progress we've made in the first half of 2024, which will help cement our leadership position in advancing innovation in non-opioid pain management. We're confident that the investments we're making will support and expand this leadership position. As discussed earlier throughout the balance of the year, we'll continue our efforts to ensure we're ready for long-term growth. The foundation work that we have undertaken leaves us well positioned for sustainable success. With that, operator, we're ready to open the call for questions.

(Emphasis added.*)*

34.    During the same call, CEO Lee responded to questions from analysts in attendance. In relevant part, CEO Lee responded to Gregory James Renza from RBC Capital Markets:

<Q: Gregory James Renza – RBC Capital Markets – Analyst> Frank, just to kick off on the generic liposomal bupivacaine approval early July, July 2. Just wondering if you could just comment on your evolving our confidence in your ability to sort of defend EXPAREL at this key point in time. To what degree was that development surprising to you? And then I have certainly a follow-up.

<A: CEO and Director Frank Lee – Pacira> Well, thanks for the question, Greg. With regard to the -- I think you're referencing the ANDA approval. And as Tony mentioned, that has nothing to do with

our case. So that's a separate matter. And that's our focus. Our confidence hasn't changed with regard to our case. And so as Tony outlined, we have multiple levels of legal action and defense that we have at our disposal. So that's unchanged.

35.     Also during the July 30, 2024 earnings call, Chief Legal and Compliance Officer, Anthony Molloy, detailed the potential outcomes of the '495 patent litigation, in pertinent part:

> I'll briefly touch on the FDA's recent approval of a generic version of liposomal bupivacaine and next steps in our Paragraph IV litigation. To remind you, the FDA's decision is a separate track and has no impact on our multiple patent infringement lawsuits against the eVenus, which are all still pending. The first case involving our 495 patent concluded in May. We believe we made a strong case that eVenus is infringing on our pat. That said, to provide clarity, I want to walk through the 3 scenarios that could play out with respect to this first lawsuit.
>
> Outcome 1. Pacira wins the lawsuit against eVenus Pharmaceutical. Under this scenario, we expect the court would [indiscernible] EVenus from launching a generic until the expiration of the 495 patent in January 2041. So even with an FDA approval, there is no ability for eVenus for to commercialize their drug unless they successfully appeal and overturn the lower court's decision.
>
> Outcome 2. The court upholds the validity of the 495 patent, but concludes that eVenus is not infringing on that particular patent. We also view this as a positive for Pacira, given that this is only the first patent being litigated. Three additional infringement lawsuits were underway for our 348, 574, 575 and 706 patents and these patents are broader than the 495 patent. We also have other patents that are forthcoming, many of which will be listed in the Orange Book with expiration dates through January 2041. In order to be commercially successful, eVenus would have to overcome all of our patents.
>
> **Outcome 3. The court concludes that 495 patent is not valid and that eVenus does not infringe. This is the least ideal scenario. If this**

*happens, we have a comprehensive strategy in place depending on the findings of the court. We firmly believe the EXPAREL franchise is well protected from multiple directions. We are committed to taking the necessary steps to protect the interest of our business, shareholders, patients and other stakeholders.*

We expect the trial opinion on its first case very soon. *As I'm sure you can appreciate, it would not be in our best interest to publicly share details around our legal strategy other than to say we believe that we have a strong legal position and that eVenus is infringing upon our patents.*

We are advancing a robust multifaceted legal strategy and we stand ready to engage with the court and vigorously defend our EXPAREL franchise in the event of any decision. That being said, we will keep our investors informed as this process unfolds. I want to emphasize that we have a responsibility of patients, their clinicians and other stakeholders to vigorously defend our intellectual property and a proven safety and integrity of EXPAREL.

(Emphasis added.*)*

36.    The above statements in Paragraphs 28 to 35 were false and/or materially misleading. Defendants created the false impression that Pacira had sufficient patent protections on Exparel, and as such, the ability to expand the marketing, production, and sales of Exparel, which the Company stated was critical to its future growth and revenue. In truth, Pacira's optimistic claims pertaining to its patent protections on Exparel were fragile at best. In fact, Pacira knew that the '495 patent was not as protective as Defendants publicly touted because on June 6, 2023 the New Jersey District Court issued a ruling in eVenus's favor regarding claims construction in another case filed by Pacira in a failed attempt to protect Exparel.

Yet, the Defendants continued to make public statements affirming their belief in the '495 patent and the protection it provided for Exparel. Therefore, when the '495 patent was invalidated in another case Pacira filed against eVenus, investors and analysts alike were shocked by the concerning news that Exparel, which accounts for approximately 80% of Pacira's revenue, did not have sufficient patent protect to prevent another company from producing a generic during the life of the patent.

*The Truth Emerges*

<u>August 9, 2024</u>

37.    On August 9, 2024, Pacira issued a press release announcing the results of its lawsuit against eVenus for patent infringement. In particular, the Company announced that the U.S. District Court for the District of New Jersey has found that the company's U.S. Patent No. 11,033,495 (the '495 patent) is not valid. CEO Frank D. Lee stated, in relevant part:

> We remain steadfast in our belief in the strength and validity of our intellectual property and that eVenus is infringing upon our patents. In light of the Court's decision, we are considering our legal options, which include pursuing an appellate review at the U.S. Court of Appeals for the Federal Court as warranted.
>
> We firmly believe we have built a strong portfolio of intellectual property and that the EXPAREL franchise is well protected on multiple levels. Three separate infringement suits are underway, and we have additional patents that are forthcoming.

19

38.    The aforementioned press releases and statements made by the Individual Defendants or otherwise about the Company are in direct contrast to their public statements made during the Class Period. In those releases and calls, Defendants continually touted the Company's expected pursuit to expand the use of Exparel, including large investments in sales, marketing, and manufacturing capacity of Exparel. Particularly, Pacira showcased additional patent protection on Exparel on multiple occasions, despite the fact weakness of the Exparel patents as demonstrated in court.

39.    Investors and analysts reacted immediately to Pacira's revelation. The price of Pacira's common stock declined dramatically. From a closing market price of $22.36 per share on August 8, 2024, Pacira's stock price fell to a low of $11.70 per share on August 9, 2024, a decline of over 47% in a single day.

40.    A number of well-known analysts who had been following Pacira lowered their price targets in response to Pacira's disclosures. For example, on August 12, 2024, J.P. Morgan published a report titled "Downgrading to UW: Patent Invalidity Is Worst Case Scenario, and We Don't See Path to Recovery in Near Term," stating, in pertinent part:

> We see the ruling as a worst case scenario and are cutting our Exparel estimates. We think the Judge ruling the '495 patent invalid (as opposed to valid but not infringed) will put a cloud over the strength of Pacira's remaining patents on Exparel, rightly or wrongly, and it may encourage additional generic players to enter the market over time. We note however that PCRX is not aware of any additional ANDA filings at this

time. From here, it is unclear if eVenus will launch immediately at-risk and what amount of volume can it bring to market (the company's mfg capabilities are unknown). As a result, we still forecast ~$300mm of Exparel sales in 2025 (-45% y/y) and $200mm in 2026 and then declining to ~$100mm of tail revenue in 2030 (-90% vs our prior ests).

41.  Then, on August 13, 2024, Truist Securities published a report downgrading Pacira to sell following the "imminent" entry of generic Exparel. In relevant part:

> Invalidity due to obviousness and anticipation is a major setback, with a ~10% chance of winning on appeal. PCRX can focus on other eVenus litigation, but it will soon face competition from other ANDA filers given the ruling. Even with substantial marketing efforts, providers may not have a strong preference towards the Exparel brand. Sherkow thinks Pacira will likely push the gas on the other two litigation cases but generic entry is unavoidable, barring any manufacturing issues. Preliminary injunction is unlikely but Pacira could potentially win a small royalty claim.

> We think Pacira's risk profile has significantly worsened given the lucrative opportunity for additional competitors ahead of NOPAIN and potential readthrough to other patents. Moreover, we anticipate lower investor confidence and plausible question of credibility. Although we appreciate the company's pipeline (Table 2), we cannot rule out a potential strategy shift and possible company-wide restructuring to revisit its cost structure.

> As for our model, we now assume eVenus launches at risk by 4Q24, minimally impacting Exparel sales, with a scaled impact throughout 2025. We also expect other ANDA filers and ultimately see the market settle among 2-3 generics. We think Exparel sales have peaked and call for stabilization in the sub $100M range from 2028 on. We reflect our COGS and OpEx estimates accordingly. We now model 2025 revenue/EBITDA/EPS of $551M/$145M/ $3.30, previously $770M/$262M/$4.88.

Net-net, we downgrade PCRX to SELL (from BUY) and cut our PT to $8 (from $30). Our PT is derived using DCF analysis (WACC 18% and terminal growth rate of 1%). Upside risks include delays in generic entry, favorable appeal decision, and upside from current pipeline. We see more compelling opportunities elsewhere.

42. The fact that these analysts, and others, discussed the major setback of the '495 patent invalidity ruling, going as far as to call it the "worst case scenario" suggests the public placed significant weight on Pacira's prior statements of confidence in both the '495 patent and Pacira's sole ownership of Exparel. The frequent, in-depth discussion of Pacira's intellectual property protection and the weight placed on Exparel confirms that Defendants' statements during the Class Period were material.

*Loss Causation and Economic Loss*

43. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Pacira's common stock and operated as a fraud or deceit on Class Period purchasers of Pacira's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Pacira's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Pacira's common

stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

44.    Pacira's stock price fell in response to the corrective event on August 9, 2024, as alleged *supra*. On August 9, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Pacira's forecasting processes and growth guidance.

45.    In particular, on August 9, 2024, issued a press release titled "Pacira BioSciences Comments on Ruling on EXPAREL Patent Litigation from U.S. District Court for the District of New Jersey" wherein the Company announced the '495 patent had been invalidated by a district court judge in New Jersey as part of the ruling in Pacira's case against eVenus. This ruling came almost three years after Pacira filed the case, alleging that eVenus was infringing its '495 patent. In addition to invalidating the patent, the Court concluded that there was no infringement by eVenus due to obviousness and anticipation. The '495 patent provided intellectual property protection for Pacira over Exparel, the Company's main source of growth, encapsulating approximately 80% of its revenue.

*Presumption of Reliance; Fraud-On-The-Market*

46.    At all relevant times, the market for Pacira's common stock was an efficient market for the following reasons, among others:

a.    Pacira's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

b.    Pacira communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.    Pacira was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.    Unexpected material news about Pacira was reflected in and incorporated into the Company's stock price during the Class Period.

47.    As a result of the foregoing, the market for Pacira's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Pacira's stock price. Under these

circumstances, all purchasers of Pacira's common stock during the Class Period suffered similar injury through their purchase of Pacira's common stock at artificially inflated prices, and a presumption of reliance applies.

48.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

*No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they led investors to believe that Pacira had valuable patent protections for Exparel while at the same time failing to disclose the multitude of legal issues the Company was facing regarding its patents protecting Exparel. Defendants provided the public with extensive plans to expand the use, market, and manufacture of Exparel, which would account for the majority of the Company's growth, that failed to account for this flimsy patent protections that Pacira actually

had for Exparel/or adequately disclose the fact that the Company at the current time did not have adequate patent protections for Exparel.

50. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

51. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Pacira who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Pacira's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pacira's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pacira or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 1, 2024, there were approximately 46.2 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located

throughout the country and possibly the world. Joinder would be highly impracticable.

54.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pacira;

      c.    whether the Individual Defendants caused Pacira to issue false and misleading financial statements during the Class Period;

    d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    e.     whether the prices of Pacira's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    f.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

*Against All Defendants for Violations of*

*Section 10(b) and Rule 10b-5 Promulgated Thereunder*

58. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against defendants and is based upon Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme,

conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon. Plaintiff and the other members of the Class; made various

untrue statements of material facts and omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they

were made, not misleading; and employed devices, schemes and artifices to defraud

in connection with the purchase and sale of securities. Such scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including

Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and

maintain the market price of Pacira common stock; and (iii) cause Plaintiff and other

members of the Class to purchase or otherwise acquire Pacira's securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course

of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct,

each of the defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Pacira's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

62.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Pacira's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Pacira's businesses, operations, future financial condition, intellectual property, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Pacira's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Pacira's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Pacira's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Pacira's common stock at

prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Pacira's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Pacira's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

68.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Pacira's misstatements.

70.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Pacira which had become materially false or misleading.

71.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Pacira disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Pacira to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in

the unlawful conduct alleged which artificially inflated the market price of Pacira's common stock.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Pacira to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants and/or Pacira are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 13, 2025                              Respectfully submitted,

**LEVI & KORSINSKY, LLP**

_/s/ Adam M. Apton_              
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*